JUSTIN T RUSK, OSB NO. 175946
E-mail: justinr@jhoffman.com
Janet Hoffman & Associates LLC
1000 SW Broadway, Ste. 1500
Portland, OR 7205
Telephone: (503) 222-1125

*Attorney for Defendant Joseph Robert Purdy*

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OREGON
PORTLAND DIVISION

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>JOSEPH ROBERT PURDY,<br><br>　　　　Defendant. | Case No. 3:23-cr-00064-IM<br><br>**SENTENCING MEMORANDUM ON BEHALF OF DEFENDANT JOSEPH ROBERT PURDY** |

Defendant Joseph Robert Purdy ("Mr. Purdy"), by and through his undersigned counsel, respectfully submits this Sentencing Memorandum and accompanying materials for consideration of the Court for the upcoming sentencing hearing scheduled for September 13, 2023. Mr. Purdy provides this Sentencing Memorandum along with the additional confidential materials submitted to this Court to show that the jointly recommended sentence of probation in this matter is sufficient, but not greater than necessary to achieve the sentencing purposes and objectives of Section 3553(a).

///

///

I.      **INTRODUCTION**

Mr. Purdy stands before the Court as a result of lapse in judgment related to his employment with the victim company while on paternity leave awaiting the birth of his first child. Mr. Purdy appears for sentencing convicted pursuant to his early guilty plea to an Information charging him with a single count of access device fraud in violation of 18 U.S.C. §§ 1029(a)(3) and (c)(1)(A)(i).

A Presentence Report ("PSR") was completed in this matter and submitted to the Court for consideration. As noted in the PSR, during a period of time in which Mr. Purdy should not have been working, he accessed certain areas of the company's internal database and obtained client data consisting of client customers' email addresses provided for marketing purposes and transferred those email addresses to a third-party. Immediately upon being contacted by the company following its learning of the data breach, Mr. Purdy cooperated with the company identifying all of the client data at issue, and worked to rectify his misconduct to the best of his ability. Further, Mr. Purdy accepted responsibility and cooperated with the Government investigation in this matter, ultimately waiving his right to Indictment and pleading guilty to the underlying Information in this matter.

Mr. Purdy's offense represents a clear aberration in his life where he is known for his responsibility and dedication to his friends and family and his hard work ethic. While the facts of Mr. Purdy's offense have been outlined in the PSR, the context of how Mr. Purdy found himself engaging in the misconduct and the steps he has taken - both to try and minimize the impact of his conduct on others and to take responsibility for his conduct - have not been fully explained. Mr. Purdy takes this opportunity to provide additional context to his offense to show why a thirty-three month sentence of probation is a sufficient, but not greater than necessary sentence in this matter.[1] Based on the unique nature of Mr. Purdy's conduct, the

---

[1] Both the Government and the Probation Office recommend a three-year term of probation in this matter. Mr. Purdy does not object to, and likewise recommends, a three-year term of

lack of any significant monetary gain, Mr. Purdy's immediate and continued cooperation with the company, his dedication to his family, and his continued behavior while on pretrial release a custodial sentence in this matter would be absolutely greater than necessary to achieve the sentencing objectives of section 3553(a).

II. MR. PURDY'S BACKGROUND AND CHARACTER

Mr. Purdy, the Person

Mr. Purdy is a thirty-one-year-old devoted father to his new son, and a loving husband to his wife. He grew up in Oregon as the youngest son of divorced parents. During his youth, his mother described him as an "easy child" without significant disciplinary issues. While he was a good student, he found that academics was not where he wanted to focus his live. Instead, he found a calling in computer software infrastructure and is relatively self-taught in programming and software coding. He started working immediately after high-school and has worked his way up through various computer-based fields as his skills developed.

Mr. Purdy is described by his friends and family as a "well-founded and responsible member of society." While he made a mistake, as addressed below, he is the kind of person who when given the chance will continue to grow and make better more responsible choices and be a role model for his son. As noted in the PSR, he is a pro-social individual with no prior criminal history and has behaved exemplary on pretrial release during the pendency of this matter. As the submitted character letters from friends and family make clear, Mr. Purdy

---

probation. However, Mr. Purdy requests the Court grant three-months credit to the term of probation reflecting back to his original sentencing date of June 12, 2013, which corresponded to his early plea back in March. While the sentencing was continued for three-months, the purpose of the continuances was to allow Mr. Purdy to continue resolving matters with the company without necessity of the Court's involvement, which has been accomplished. During this three-month period Mr. Purdy was on supervised release and performed similarly to what his terms of probation would be. As such, a recognition of this three-month period would be appropriate.

is a responsible, caring, and loyal individual who has accepted responsibility for his conduct and who has learned from his mistake.

Mr. Purdy's Specific Offense Conduct

Prior to the instant offense, Mr. Purdy had worked at the victim company for nearly six years. At the time of the misconduct, Mr. Purdy was an enablement engineer, a role that helped other employees address issues in accessing data and creating ways behind the scenes for employees to obtain necessary systems data to do their own jobs.

Beginning sometime in approximately late 2021, an unknown individual had begun contacting various employees of the company with various phishing communications and requests for access to company data. The individual contacted employees on a number of various platforms and messaging systems, often with different names. Mr. Purdy was eventually contacted by this unknown third-party in April 2022. Upon being contacted, Mr. Purdy reached out to company management and requested permission to communicate with the third-party to determine what kind of customer data the person was interested in and to try and get additional information from the third-party in the hopes of helping the company and stopping the ongoing messaging. The company granted Mr. Purdy authority to communicate with the third-party but none of his messages or communications went anywhere in that earlier period. Beginning in May 2022, Mr. Purdy went on a combination of paternity leave and a short sabbatical in preparation of the birth of his son.

While he was on paternity leave, Mr. Purdy's wife experienced complications with her pregnancy. Those complications precipitated a planned induction date several weeks earlier than anticipated. Being a first-time parent, along with the normal anxiety and stress associated with pregnancy and planned parenthood, those additional complications added to Mr. Purdy's anxiety. By mid-May, Mr. Purdy's sleep schedule had been dramatically affected and he was regularly awake in the early morning hours and sleeping minimally. It was at this time, just a

few days before his son was born, that Mr. Purdy was again contacted in the early morning hours by the third-party requesting customer data from the company.

This time, instead of again reaching out to company management for approval as he had done previously, Mr. Purdy responded to the bad actor in the early morning hours with the initial intent to again try to mislead the person. Upon learning that the bad actor wanted information from a particular company client, Mr. Purdy improperly accessed the company servers and obtained the requested data to see what the information looked like. His plan was to transpose the data set with fake information. At the time, he was not authorized to access that data and download it externally. However, rather than send the fake data, Mr. Purdy mistakenly sent the real data which included real client customer email addresses. Mr. Purdy learned of his mistake when the validity of the email addresses was confirmed as legitimate by the bad actor.[2] The bad actor then requested some additional client data sets.

Realizing that he had screwed up and sent real data, Mr. Purdy panicked. Over concern about being exposed for improperly sending data and losing his job right before the birth of his son, Mr. Purdy complied with the bad actor's requests. He then accessed and provided additional data sets for a limited number of company clients over the next two anxiety provoking and stressful weeks following the birth of his son. Mr. Purdy stopped cooperating with the bad actor after the bad actor demanded direct server access and privileges which Mr. Purdy could not and would not provide.

Mr. Purdy's Cooperation and Acceptance of Responsibility

Sometime in late June 2023, the bad actor contacted one of the company's clients and attempted to extort that client with the client's customers' email addresses. Due to the unique data signatures within the data, it was determined that the email addresses had originated from

---

[2] It is believed that the legitimacy of the email addresses was established by the inclusion of the bad actor's email address somewhere within the data set.

Defendant's Sentencing Memorandum  **5 | Page**
UNITED STATES V. JOSEPH PURDY, Case No. 3:23-CR-00064-IM

the company. The company initiated an investigation which quickly determined that Mr. Purdy was a potential source of the data.

The company contacted Mr. Purdy who cooperated with the company's investigation, including participation in a series of interviews (even after being informed that law enforcement had been contacted and was involved). While Mr. Purdy recognized that he couldn't go back in time and fix the issue he caused for the company, he was determined to help the company address the issue going forward. Mr. Purdy admitted his conduct and identified all of the clients involved so that the company would be able to contact those clients directly and address the data breach. Mr. Purdy also provided what information he had about the bad actor. As a result of his cooperation, the company was able to confirm the full extent of the data involved in the breach, contact those clients, and mitigate potential harm. Further, following his termination, Mr. Purdy agreed to continue to assist the company if necessary if further issues arose.

Mr. Purdy also cooperated with the Government in its investigation and again admitted his conduct and provided what information about the third-party that he had. Mr. Purdy then waived his right to Indictment and pled guilty at the earliest opportunity to the present offense.

Mr. Purdy is deeply ashamed and remorseful of his conduct and the harm he caused the company as reflected in his immediate cooperation and continued acceptance of responsibility. Further, since the time of his misconduct, and recognizing issues related to his anxiety and stress, Mr. Purdy has engaged in therapy to help his address these issues. He has worked hard over the past year to raise his one-year-old son and volunteers at his daycare. Mr. Purdy has also found a new job that allows him to support his family and, as noted in the PSR, satisfy any necessary restitution.

///

///

///

### III. THE GOALS AND OBJECTIVES OF SENTENCING ARE BEST MET IN THIS CASE BY A SENTENCE OF PROBATION, RATHER THAN INCARCERATION

In determining the appropriate sentence for Mr. Purdy in this matter, it is the "sentencing judge's overarching duty under § 3553(a) to 'impose a sentence sufficient, *but not greater than necessary*' to comply with the sentencing purposes set forth in § 3553(a)(2)" and achieve society's goals of rehabilitation, deterrence, and retribution. *Pepper v. United States*, 562 U.S. 476, 491 (2011) (emphasis added). To arrive at a sufficient sentence, district courts are directed to consider (1) the nature and circumstances of the offense including the unique history and characteristics of the defendant; (2) the need for the sentence imposed to provide just punishment, deterrence, and needed educational and vocational training; (3) the kinds of sentences available; (4) the sentencing range established by the United States Sentencing Guidelines along with pertinent policy making statements issued by the Sentencing Commission; (5) the need to avoid unwarranted sentence disparities among similarly situated defendants; and (6) the need to provide restitution. *See* 18 U.S.C. § 3553(a). As recognized by the Ninth Circuit, sentencing is "an art … to be performed … as a sensitive response to a particular person who has a particular personal history and has committed a particular crime." *United States v. Harris*, 679 F.3d 1179, 1183 (9th Cir. 2012). For every case, the sentencing court "must make an individual assessment based on the facts presented" to ensure that the sentence imposed is not greater than necessary for each individual defendant. *Gall v. United States*, 552 U.S. 38, 50 (2007).

Here, these fundamental principles call for a non-custodial sentence for Mr. Purdy. First, the overall guideline range in this action is low reflecting the atypical nature of Mr. Purdy's offense. Second, a sentence of probation is sufficient to provide adequate

deterrence and provide just punishment, especially in light of his cooperation and attempts to cure his conduct and help the company to the best of his ability. Further, a sentence of probation reflects the fact that Mr. Purdy has learned from this whole experience and is not in need of any rehabilitation.

### A. THE GUIDELINE CALCULATION IN THIS ACTION

Before turning to the Section 3553(a) factors, the preliminary step in any sentencing is for the Court to properly calculate the recommended sentencing range proposed in the Sentencing Guidelines. *See United States v. Carty,* 520 F.3d 984, 991 (9th Cir. 2008) (en banc); *see also Gall,* 552 U.S. at 49 ("a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."). This calculation is to be done solely as "a matter of administration" to secure a nationwide "starting point" and "initial benchmark." *Gall,* 552 U.S. at 49.

Here, the final PSR calculates a pre-amendment guideline total offense level of 13 and then recommends the Court consider and take into account an additional 2-level downward adjustment for reflecting the Zero-Point offender adjustment under USSG §4C1.1. Recognizing this 2-level adjustment provides an adjusted guideline offense level of 11 and a sentencing guideline range in Zone B of eight (8) to fourteen (14) months incarceration.

Mr. Purdy does not object to the Guideline calculation in the final PSR. Mr. Purdy simply notes that along with the above recognized amendment for USSG §4C1.1, the amended commentary relating to Zero-Point offenders under USSG § 5C1.1(a) further provides enhanced guidance that the "generally appropriate" sentence for criminal defendants that fall within Zone A or Zone B, like Mr. Purdy, is "a sentence other than a sentence of

imprisonment." *See* Amended Commentary for USSG § 5Cl.1, Application Note 10 for "Zero-Point Offenders".

> B. **THE RELEVANT GOALS OF SENTENCING ENUMERATED IN SECTION 3553(A) SUPPORT IMPOSING A SENTENCE OF PROBATION UPON MR. PURDY**

Although the Court is required to calculate the Guideline range as a starting point for evaluating an appropriate sentence, it is "emphatically clear" that the Guidelines are simply "advisory." *See e.g.*, *United States v. Cavera,* 550 F.3d 180, 189 (2d Cir. 2008). The Guideline range cannot be presumed reasonable. *Rita v. United States*, 551 U.S. 338, 351 (2007) ("the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply"). The Ninth Circuit has specifically held that the Guidelines are not to be given "more or less weight than any other" of the § 3553 factors. *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). Rather, the Court must conduct its own independent review of the sentencing factors enumerated in Section 3553(a) and a Court may vary from the Guidelines range based on the other sentencing factors and for "policy considerations, including disagreements with the Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007); *see also, Gall*, 552 U.S. at 49-51; *United States v. Booker*, 543 U.S. 220, 245 (2005). The Ninth Circuit has previously approved of steep downward departures and non-incarceration sentences for defendants based on non-Guideline characteristics such as a long history of law abidingness, a history of community involvement and employment, support of family, the absence of future potential risk to the public, and the appropriateness of restitution. *See e.g., United States v. Ruff,* 535 F.3d 999, 1001 (9th Cir. 2008) (noting factors upholding a downward departure from the Guidelines range). Here, the Section 3553(a) factors warrant imposition of a probationary sentence for Mr. Purdy.

First, Mr. Purdy's personal characteristics, including the atypical nature of his offense conduct in an otherwise law-abiding life, justify a probationary sentence. Section 3553(a)(2) requires the Court to consider the nature and circumstances of the offense as well as Mr. Purdy's history and characteristics, and "make an individualized assessment based on the facts presented" as to the appropriate sentence in this matter. *Gall,* 552 U.S. at 50. In the unique circumstances of this offense, this factor supports a sentence of probation. Mr. Purdy's offense conduct was atypical both in his life- where he was, and has been since this offense, a law-abiding citizen - and within the confines of access device fraud where he did not obtain the email addresses for his own personal use and did not personally take and try and use the email addresses to defraud people. Further, Mr. Purdy's extremely limited personal benefit was an after-thought that he deeply regrets. He only received approximately $1000 for his conduct, which was provided later by the bad actor, after the data sets had been accessed, and so he was not otherwise motivated by greed of monetary benefit in engaging in his misconduct.

Second, a probationary sentence in this matter reflects the seriousness of the offense, recognizes a respect for the law, and would constitute just punishment in this matter. As noted above, Mr. Purdy's offense was atypical from normal access device fraud cases where an individual obtains emails for their own nefarious purposes. It is undisputed that Mr. Purdy did not intend to use the email addresses himself. Further, Mr. Purdy cooperated with the company during and after its investigation and accepted responsibility for his conduct as reflected in the underlying plea agreement. This conduct reflects Mr. Purdy's respect for the law.

Moreover, a probationary sentence constitutes just punishment. *See United States v. Edwards,* 595 F.3d 1004, 1016 (9th Cir. 2010) (recognizing probation as a significant punishment); *see also, United States v. Coughlin,* 2008 U.S. Dist. LEXIS 11263, *20-22

(W.D. Ark. Feb. 1, 2008) ("Home detention and probation can be severe punishments, hugely restrictive of liberty, highly effective in the determent of crime and amply retributive."). Indeed, in *Gall,* the Supreme Court noted that "[p]robation is not granted out of a spirit of leniency" and that probation conditions "can have a significant impact on both that person and society ... often these conditions comprehensively regulate significant facets of their day-to-day lives." 128 S. Ct. at 596. In contrast, a term of incarceration can be deleterious and detrimental to the rehabilitation for individuals like Mr. Purdy - non-violent offenders with no criminal history.[3]

Additionally, Mr. Purdy has already suffered from the impact of his conduct, including the termination of his prior employment, having to admit his conduct to friends and family, the loss of respect from his co-workers, a potential restitution judgment, and the effect of now being a convicted felon. Regardless of his ultimate sentence, he will continue to experience the consequences of his actions and the resulting prosecution for the rest of his life. Courts have expressly noted that a sentencing court can, and should, take such collateral consequences into account in fashioning a sentence; indeed, "[i]t is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence." *United States v. Stewart,* 509 F.3d 93, 141 (2d Cir. 2009). And, as is regularly recognized by the courts, the felony conviction alone constitutes a significant punishment for

---

[3] *See, e.g.,* United States Sentencing Commission, Sentencing Options Under the Guidelines (1996) (recognizing the "criminogenic effects of imprisonment which include contact with more serious offenders, disruption of legal employment, and weakening of family ties"); Justin Murray, Reimagining Criminal Prosecution, 49 American Criminal Law Review (2012) at 1565 ("Rather than rehabilitating prisoners, modem incarceration tends to make prisoners more violent, antisocial, and prone to criminality"). Many who study prison life recognize that "[r]ecidivism may be promoted by the behavior traits prisoners develop while incarcerated" as to survive, they "tend to develop characteristics institutionally selected for survival: circumspection, canniness, coldness, and cruelty." *United States v. Bannister,* 786 F.Supp.2d 617 (E.D.N.Y., 2011).

an individual like Mr. Purdy as he will forever carry this conviction on his record which carries with it a "permanent and pervasive" stigma. *United States v. Smith,* 683 F.2d 1236, 1240 (9th Cir. 1982).[4]

A probationary sentence also comports with the objectives of providing both communal and specific deterrence. As noted in the PSR, Mr. Purdy is not a future risk to the public and the chance of recidivism is essentially non-existent here. He is a 31-year-old first-time offender with strong family support who made an isolated mistake under unique circumstances. Further, he accepted responsibility for his conduct and has worked to make amends with the company. There is no need to provide a further punishment in order to deter him from future unlawful conduct. Further, with regard to general deterrence, there is no direct relationship between a harsh punishment issued against one particular defendant for committing a crime and any deterrent effect in the community.[5] Rather, it is the mere fact that a defendant is prosecuted that provides the greatest deterrent effect to the rest of society.[6] This

---

[4] *See also,* Wayne A Logan, INFORMAL COLLATERAL CONSEQUENCES, 88 Wash. L. Rev. 1103 (2013) ("Today, convict status serves as a perpetual badge of infamy, even serving to impugn reputation beyond the grave."); Michelle Alexander, THE NEW TIM CROW (Paperback ed. The New Press 2012) at p. 94 ("Once a person is labeled a felon, he or she is ushered into a parallel universe in which discrimination, stigma, and exclusion are perfectly legal."); *United States v. Wulff,* 758 F.2d 1121, 1125 (6th Cir. 1985) ("a felony conviction irreparably damages one's reputation").

[5] *See, e.g.,* Nat'l Research Council; Nat'l Academies of Sciences, Engineering, and Medicine (2014) *The Growth of Incarceration in the United States: Exploring Causes and Consequences,* 134-40, 337 (concluding that "insufficient evidence exists to justify predicating policy changes on the general assumption that harsher punishments yield measurable deterrent effects"), *available at* https://doi.org/10.17226/18613. Even the Department of Justice's National Institute of Justice concluded that "[i]ncreasing the severity of punishment does little to deter crime." *See* Five Things About Deterrence (2016), *available at* https://nij.gov/five- things/pages/deterrence.aspx.

[6] Research shows that the certainty of being caught and punished has a natural deterrent effect, while "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." *See* Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime & Jus. 1, 28 (2006); *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime,* 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").

is especially true in cases like these were that are unique circumstances leading up to the offense which are not often repeated in the community.

Finally, in fashioning an appropriate sentence, the Court can consider the effect that a term of incarceration would have, not only on Mr. Purdy, but also on the continued relationship with his son, and his ability to work and continue to provide for his family. As noted in the accompanying character letters, a term of incarceration would force his family to endure not only the overwhelming emotional burdens of incarceration, but also substantial financial burdens from not being able to help raise his son and cover costs of childcare which could, in turn, jeopardize his wife's career while also adversely affecting his future ability to satisfy any potential restitution. Moreover, a term of incarceration would deprive his family and friends of the unwavering support that Mr. Purdy provides to their lives. Based on all of the above, the jointly recommended sentence of probation in this matter is sufficient, but not greater than necessary to achieve the sentencing purposes and objectives of Section 3553(a).

## IV.　CONDITIONS OF PROBATION

In response to the draft PSR, Mr. Purdy objected to a number of special conditions of probation or supervised release that were recommended to be imposed by the Court. In particular, Mr. Purdy objected to Condition 2, 4, 5, 8, ad 9. Following the objections, the Probation proposed some modifications to some of the special conditions, and rejected others. In light of the Probation Office's clarification of its interpretation of Special Condition 2 being limited to unnecessary and inappropriate contact and that appropriate and legitimate contact be allowed with appropriate discretion, Mr. Purdy withdraws his objection to this condition.

Similarly, with the modification by the Probation Office to Special Condition 4 related to already installed encryption software by his current employer, Mr. Purdy withdraws his objection to this condition.

Mr. Purdy likewise withdraws his objection to Special Condition 5 on the basis that if his current employment if deemed to involve "unresolvable concerns," the matter will be brought to the attention of the Court for resolution rather than be resolved by the Probation Office.

As to Special Conditions 8 and 9, Mr. Purdy maintains his objections to the extent that the conditions are unrelated to his offense and impede the regularly day-to-day activity of his life, particularly as it relates to credit card purchases for regular daily expenditures like groceries and living expenses, or the need to address certain emergencies for which approval by the Probation Office is not attainable. Clarification of the scope of what would and would not be deemed a violation of this condition on the record would be appropriate if these special conditions are imposed.

V. **RESTITUTION**

Presently, ACE American Insurance Company ("ACE") has made a request for restitution in the amount of $98,136.51 based upon four different costs that it claims it paid on behalf of the company victim in this matter: external forensic investigation costs, public relations counseling costs, attorney's fees, and a self-insured retention.

Mr. Purdy does not object to or contest the $21,888.43 identified by ACE as reimbursement for external forensic investigation costs incurred by the company. Likewise, Mr. Purdy does not object or contest the $25,000 identified by ACE as reimbursement for the public relations counseling costs incurred by the company following disclosure of Mr. Purdy's misconduct.

ACE has also submitted $46,248.08 in attorney's fees. Mr. Purdy objects to any amount included in the submitted attorney's fees that are not recoverable as part of a restitution award following the Supreme Court's decision in *Lagos v. United States*, 138 S. Ct. 1684 (2018). Specifically, Mr. Purdy objects to the inclusion of attorney's fees that do not qualify as "expenses incurred during participation in the investigation or prosecution of the offense" under 18 U.S.C. § 3663A(b)(4). In *Lagos*, the Supreme Court held that the MVRA does not allow for the Court to impose restitution related to a victim's expenses incurred before a government's investigation was initiated or that were unrelated to the government's investigation into criminal activity. 138 S. Ct. at 1690. Similarly, following *Lagos*, District Court's in the Ninth Circuit have likewise excluded expenses., including attorney's fees, that were related to evaluating or addressing civil matters unrelated to a criminal investigation. *See e.g., United States v. Margiotta*, 475 F. Supp. 3d 1152, 1157-58 (D. Mon. July 30, 20220).

Based upon a review of the submitted attorney's fees in this matter, Mr. Purdy objects to the following $2,585.00 in fees as being outside the realm of recoverable "expenses" under the MVRA following *Lagos* and its progeny:

- $240.00 billed on June 25, 2022, related to correspondence regarding insurance issues;

- $585.00 billed on June 28, 2022, related to analyzing potential legal and contractual obligations of the company (which appears related to concerns over civil risk from the incident);

- $300.00 billed on July 5, 2022, related to advising the company on employment retention risks;

- $650.00 billed on July 6, 2022, related to a conference with client about corporate privilege and prospective civil risks;

- $300.00 billed on July 12, 2022, related to review and editing of a termination of employment agreement related to further cooperation with the company;

- $270.00 billed on July 20, 2022, related to conference with defense counsel related to the severance and cooperation agreement;

- $240.00 billed on October 19, 2022, related to responding to and filling out questionnaire by insurance company.

Additionally, Mr. Purdy objects to the insurance company's inclusion of the $5,000 self-insured retention amount as part of the recoverable restitution. By definition, the self-insured retention amount is the specific dollar amount, in this case $5,000, that must be first paid by the insured party before the insurance policy will respond to and cover any further loss. As such, the amount requested is for an amount that was not paid by ACE as part of its insurance obligations in this matter and therefore, cannot be imposed as restitution against Mr. Purdy. While ACE may have some independent subrogation right on behalf of the company[7] for that amount as a separate civil matter, such external rights do not transfer to this criminal matter under the MVRA. Accordingly, this amount should be excluded from any restitution award issues to ACE in this matter.

Based on the above, the appropriate amount of restitution to order in this matter is $90,551.51 ($98,136.51 - $5,000 (self-insured retention amount) - $2,585 (challenged attorney's fees amount).

///

///

///

---

[7] As noted in the Government's sentencing memo, the company is not pursing any separate restitution against Mr. Purdy and has been satisfied for any of its losses and expenses not covered by insurance.

## VI. CONCLUSION

For the reasons explained above, Mr. Purdy respectfully submits that a non-custodial sentence is not only warranted, but appropriate in this matter pursuant to the factors set forth in 18 U.S.C. § 3553(a) and that a sentence of incarceration would be greater than necessary to achieve the objectives and goals of sentencing. Accordingly, the Court should impose a term of probation of thirty-three months and impose a restitution figure of $90,551.51.

DATED this 8th day of September, 2023.

Respectfully submitted,

　/s/ Justin T Rusk　
JUSTIN T RUSK, OSB No. 175946
Janet Hoffman & Associates LLC
1000 SW Broadway, Suite 1500
Portland, OR 97205
(503) 222-1125

Attorney for Joseph Purdy